# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

JLG ENTERPRISES, INC.,

                    Plaintiff,

        v.

EXCALIBUR SIRES, INC.,

                    Defendant,

_____

EXCALIBUR SIRES, INC.,


                    Counter-Claimant,
        v.

JLG ENTERPRISES, INC.,


                    Counter-Defendant.

_____/

CASE NO. 1:10-cv–02138-AWI-SKO

**ORDER GRANTING MOTION TO SELL LIVESTOCK**


(Docket No. 19)

## I.   INTRODUCTION AND FACTUAL BACKGROUND

**A.     Procedural Background**

On September 10, 2010, Plaintiff JLG Enterprises, Inc. ("JLG") filed a complaint in Stanislaus County Superior Court against Excalibur Sires, Inc. ("Excalibur") asserting claims for (1) breach of livestock service agreement, (2) unjust enrichment, (3) account stated, (4) open book account, (5) work, labor, services, and materials received, (6) quantum meruit, and (7) enforcement of livestock service lien.  (Doc. 1-3 ("Compl.").)

JLG alleges that, since approximately January 1994, JLG and Excalibur have had an oral agreement whereby JLG agreed to render livestock services to bulls provided by Excalibur and boarded at JLG's facility in Oakdale, California, in exchange for Excalibur's agreement to pay for the livestock services. (Compl. ¶ 8.)   The services for Excalibur's bulls include boarding, feeding, veterinary and general health services, and semen collection. (Doc. 17, Declaration of Jack Lerch, ¶ 4.)   The parties also agreed that JLG would store the semen collected from the bulls at its secure facility for sale to others. (*Id*.)   JLG asserts that Excalibur agreed to pay on a monthly basis for the services rendered by JLG. (*Id*.)

After the parties entered into this oral agreement, Excalibur delivered a number of registered bulls to JLG's facility. (Doc. 17, ¶ 5.)   Since then, JLG has continuously provided Excalibur's bulls with livestock services. (*Id*.)   In 2007, Excalibur apparently got behind in its payments to JLG, and a balance on Excalibur's account began to accumulate. (*See* Doc. 43-2, p. 3.)[1]   In June 2010, Excalibur ceased making any payments on its account with JLG (Doc. 17, ¶ 6) and continues to refuse to make payment (Doc. 17, ¶ 20).   The principal amount due on Excalibur's account as of July 31, 2010, was $160,964.51 plus applicable interest. (Doc. 17, ¶ 6.)   Although the number has fluctuated over time, JLG presently remains in possession of 30 of the bulls Excalibur provided and continues to provide services to them.[2] (Doc. 17, ¶ 5.)

On November 22, 2010, Excalibur filed an answer to the complaint and a counterclaim against JLG. (Doc. 6.)   Excalibur asserts that it has an oral agreement with JLG to provide livestock services to the bulls it houses at JLG's operating facility.   Excalibur maintains that it does not have legal title to all the bulls that it provided for JLG to house and service. (Doc. 6, p. 14, ¶ 17.)   Instead,

---

[1] Due to the fact that several documents in the record contain no page numbers, page number references relate to the CM-ECF automatic pagination at the top of each page of filed documents rather than any page numbering contained in the cited document itself.

[2] July 2010 billing records indicate Excalibur was charged for livestock services rendered to 47 bulls that month, one of which died. (Doc. 17, Exhibit B.)   Although JLG only seeks to sell 30 bulls at this time, it advertised the sale of 46 bulls in advance of filing this motion. (Doc. 17, Exhibit D.)   JLG was apparently aware that some of the bulls it serviced for Excalibur were owned by others rather than Excalibur.   For example, in October 2010, JLG sent letters to owners of at least two of these bulls notifying them of Excalibur's overdue account and allowing them options regarding provision for the bull. (Doc. 23, Exhibit D, E.)   These two bulls are not the subject of this motion.   JLG represents that it only seeks to sell bulls it believes that Excalibur owns.

1  Excalibur leases top-rated bulls from dairy cattle producers around the country and makes payments
2  to the lessors through royalties generated from the sale of semen produced by the bulls.  (*Id.*)
3  Excalibur asserts it has the sole control and possession of the bulls as part of its lease agreements and
4  has the right to direct semen production.  (Doc. 6, p. 14, ¶ 19.)

5       On December 16, 2010, JLG filed an application for an order authorizing the sale of livestock
6  pursuant to California Civil Code §§ 3080, *et. seq.*  JLG asserts that, by virtue of Excalibur's
7  nonpayment, JLG has a lien against Excalibur's bulls in its possession; as a result of the lien, JLG
8  contends it is entitled to seek an order authorizing the sale of Excalibur's bulls housed at JLG's
9  facilities to pay the accumulated account balance.

10       On January 12, 2011, Excalibur filed an opposition arguing that it had negotiated an
11  alternative payment schedule with JLG, that JLG had initially agreed to this alternative, accepted
12  payment under the alternative, but ultimately refused to honor the agreement and demanded that the
13  full amount of the balance due be paid immediately.  (Doc. 23, ¶¶ 13-22.)  Thus, Excalibur argues
14  that JLG should be estopped from seeking an order authorizing sale of the bulls on equitable
15  grounds.  (Doc. 24, p. 3-5.)  Further, Excalibur claims that the 30 bulls that JLG proposes to sell are
16  not all owned by Excalibur, which prevents JLG from obtaining an order authorizing the sale of
17  these bulls without issuing proper notice to the owners of those bulls.  (Doc. 24, p. 5-6.)

18       On January 12, 2011, JLG filed a supplemental reply brief asserting that Excalibur's
19  opposition was untimely, that the doctrine of equitable estoppel is not applicable in this
20  circumstance, and that the bulls JLG seeks to sell are owned by Excalibur, not leased by it.  (Doc.
21  26, ¶ 3 ("It is [Larry Gerber's] belief that all of the bulls listed on Exhibit A [to be sold by JLG] are
22  bulls which are owned by Excalibur.").)

23       On January 13, 2011, Excalibur filed a supplemental declaration of David Winkels,
24  Excalibur's Chief Executive Officer.  (Doc. 28.)  Mr. Winkels states that 5 of the 30 bulls that JLG
25  seeks to sell are owned by Excalibur, but the remainder of the 30 bulls are leased to Excalibur and
26  are owned by others.  (Doc. 28, ¶¶ 9, 10.)  On January 14, 2011, JLG filed a supplemental
27  declaration of Larry Gerber and attached information downloaded from a website hosted by an entity
28  named the Holstein Association USA, Inc. ("Holstein Association") showing purported ownership

information associated with each of the 30 bulls JLG proposes to sell.  For each of the 30 bulls, the Holstein Association's website identifies Excalibur as the owner.  (*See* Doc. 29-1.)

**B.    Requested Sale Order**

The following is a list of the bulls currently in JLG's possession that it believes are owned by Excalibur and that JLG proposes to sell pursuant to the livestock lien that has arisen by virtue of Excalibur's nonpayment:

| | Bull Name | Bull No. | Registration No. |
|---|---|---|---|
| 1. | Lesperron Big Daddy | 204H2037 | M100754243 |
| 2. | Our-Favorite Shyster-ET | 204H2048 | 134779441 |
| 3. | Eskdale Momentous-ET | 204H2068 | 136707781 |
| 4. | Mr. KY-Blue Roy Casino-ET | 204H2078 | 137629147 |
| 5. | Regancrestdl S Ryker-ET | 204H2079 | 61898421 |
| 6. | Regancrest S Mystical-ET | 204H2083 | 62496490 |
| 7. | Regancrest Shottle Myrik-ET | 204H2084 | 62496435 |
| 8. | E-Evans-A Allen Rascal-ET | 204H2090 | 62613542 |
| 9. | Budjon-JK Evangelos | 204H2091 | 137533420 |
| 10. | Canyon-Breeze G Auston-ET | 204H2093 | 62897572 |
| 11. | Canyon-Breeze G Allied-ET | 204H2094 | 62897571 |
| 12. | Canyon-Breeze Storm Ames-ET | 204H2095 | 62897570 |
| 13. | Canyon-Breeze Goldwyn Ash | 204H2096 | 62897569 |
| 14. | Canyon-Breeze Storm Arch-ET | 204H2097 | 62897568 |
| 15. | Canyon-Breeze Eliminator-ET | 204H2098 | 62897573 |
| 16. | Canyon-Breeze Marsh Astonic | 204H2099 | 62897564 |
| 17. | Eskdale Hotshot-ET | 204H2101 | 138272021 |
| 18. | Budjon-JK Stormtc Element-ET | 204H2102 | 137902095 |
| 19. | Budjon-JK Stormatic Eon-ET | 204H2103 | 138263052 |
| 20. | Henkeseen Exotic-ET | 204H2106 | 63445826 |
| 21. | Henkeseen Expression-ET | 204H2107 | 63445831 |
| 22. | Regancrest PR Bloker-ET | 204H2109 | 62744760 |
| 23. | Regancrest Mac Bence-ET | 204H2110 | 62744695 |
| 24. | Regancrest Mac Benat-ET | 204H2111 | 62744687 |

| 25. | Bonaccueil Duplicate | 204H2112 | 103862758 |
| 26. | Ralma Mac Granite-ET | 204H2113 | 53451987 |
| 27. | Hnkes-Wessel Emmitt-TW | 204H2114 | 63445910 |
| 28. | Hnkes-Wessel Enforce-TW | 204H2115 | 63445911 |
| 29. | Mr. Golfing America-ET | 204H2116 | 139245811 |
| 30. | Sonnek Damion Archmedes-ET | 204H2118 | 139072848 |

(Doc. 19-1, Exhibit A.)

**C.    Excalibur's Supplemental Briefing**

Following the January 26, 2011, hearing on this motion, the Court provided the parties additional time to present evidence and supplemental briefing regarding ownership of the 30 bulls identified above.  On February 7, 2011, Excalibur filed additional briefing with several exhibits it purports indicate that the above bulls are *leased* by Excalibur, but are *owned* by others.  Excalibur asserts that JLG cannot obtain a sale order as to these bulls without providing notice to the owners of the bulls.  (Doc. 33, p. 2.)

Excalibur filed exhibits attached to a declaration of David Winkels, which are described as follows: [3]

1.    **Docket No. 34:**  A purported lease agreement between Excalibur and Lesperron Holsteins for the lease of the bull named Lesperron Big Daddy, Registration No. 100754243.  (Doc. 34-1 at 2-4.)  Lesperron Holsteins is the bull owner, according to the lease.[4]  (*Id.*)

2.    **Docket No. 34:**  A purported lease agreement between Excalibur and Steven Gillens for bulls (1) Canyon-Breeze G Allied-ET, and (2) Canyon-Breeze Eliminator-ET.  (Doc. 34-1, p. 6-13.)

3.    **Docket No. 35:**  A "Sire Development Agreement" between Excalibur and Gale Hoese dba

---

[3] The manner in which the documents were filed is somewhat confusing.  It appears that David Winkels signed a single declaration and each of the exhibits filed at Docket Nos. 34-41 was intended to be attached to that declaration. Instead, however, David Winkels' declaration was filed 8 times, and each exhibit was filed as a single attachment to the declaration.

[4] Certain pages appear to be missing from the lease agreement related to Lesperron Big Daddy as paragraphs 4 through 18 are omitted from the document.

Hoese Investment Group.  (Doc. 35-1, p. 2-8.)  The Sire Development Agreement is not a lease between Excalibur and owners of various bulls, but an agreement between Excalibur and an investment group; the agreement recites that certain bulls are leased by Excalibur, some of which may be the subject of the Sire Development Agreement.

4.   **Docket No. 36:** A purported lease agreement between Excalibur and Matt and Mandy Nunes regarding the bull named Scientific CBA Drama – ET.  (Doc. 36-1, p. 1-7.)

5.   **Docket No. 37:** A Holstein Association USA, Inc. Certificate of Registration indicating that Excalibur is the record owner of a bull named Mr. Golfing America–ET. (Doc. 37-1, p. 2-3.) This exhibit is attached to the declaration of David Winkels wherein he states that the Certificate of Registration "is not intended to show ownership as articulated on the document." (Doc. 37, ¶ 5.)

6.   **Docket No. 38:** A purported lease agreement between Excalibur and Gale Hoese dba Hoese Investment Group.  The lease involves 12 bulls that Gale Hoese purportedly owns and leases to Excalibur.  (Doc. 38-1, p. 1-10.)

7.   **Docket No. 39:** A purported lease agreement between Excalibur and Kevin Jimerson and Kick-It-Up Holsteins that indicates that the bull named Mr. Ky-Blue Roy Casino–ET is leased by Excalibur.  (Doc. 39-1, p. 1-7.)

8.   **Docket No. 40:** A purported lease agreement between Excalibur and James Martin that indicates that a bull identified as "1st choice Champion x MBZ Hershel Emerald" is leased by Excalibur.  (Doc. 40-1, p. 1-8.)

9.   **Docket No. 41:** A purported lease agreement between Excalibur and Matt and Mandy Nunes for lease of the following identified sire/bull: "First Choice: Lichtblick x Debut." (Doc. 41-1, p. 1-8.)

**D.   JLG's Supplemental Briefing**

On February 11, 2011, JLG filed a supplemental brief in support of its motion for an order authorizing the sale of the 30 bulls listed above.  (Doc. 42.)  JLG filed Certificates of Registration from the Holstein Association indicating that Excalibur is the registered owner of each of the 30 bulls JLG seeks to sell.  (Doc. 44-1, p. 2-61.)  JLG also produced additional billing invoices related

6

to Excalibur's account for the period from December 12, 2005, to December 31, 2010.  (Doc. 43, ¶ 4; Doc. 43, Exhibit B.)  Finally, JLG filed objections to certain exhibits to the February 7, 2011, declaration of Mr. Winkels.  (Doc. 46.)

## II.   DISCUSSION

### A.   Choice of Law

In diversity cases, a federal court must apply the law of the state to the extent mandated by the principles set forth in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).  "Pursuant to *Erie* and its progeny, federal courts sitting in diversity apply state substantive law and federal procedural law." *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 666 (9th Cir. 2003) (citing *Erie*, 304 U.S. at 78).  This action was removed from California state court on the basis of diversity as Excalibur is a Minnesota corporation, JLG is a California corporation, and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a); *see also* 28 U.S.C. § 1441(a).  Neither party disputes that California law applies.

### B.   Applicable California Law

Section 3080.01 of the California Civil Code provides that "[a] livestock servicer shall have a general lien upon the livestock in its possession to secure the performance of all obligations of the owner of the livestock to the livestock servicer."  Section 3080.01 provides that a livestock servicer may collect for the following:

(a)  The provision of livestock services to the livestock in possession of the livestock servicer.

(b)  The provision of livestock services to other livestock for which livestock services were provided in connection with or as part of the same livestock service transaction, if such livestock services were provided within the immediately preceding 12 months prior to the date upon which the lien arose.  The lien shall have priority over all other liens upon and security interests in the livestock, shall arise as the charges for livestock services become due, and shall be dependent upon possession.  The lien shall secure the owner's contractual obligations to the lienholder for the provision of livestock services, the lienholder's reasonable charges for the provision of livestock services after the lien has arisen as set forth in Section 3080.02, and the lienholder's costs of lien enforcement, including attorney's fees.

Upon a livestock servicer's application for an order authorizing the sale of livestock, the court may authorize such a sale if it finds all of the following:

(1) The claim upon which the lienholder's action is based is a claim giving rise to a

lien upon which an order authorizing sale may be issued under this chapter;

(2) The lienholder has established the probable validity of the claim upon which the action is based;

(3) The lienholder has established the probable validity of the lien sought to be enforced by sale;

(4) The sale is necessary to prevent a possible decline in the value or condition of the livestock or that the sale should be held in the interests of equality;

(5) The sale is not sought for a purpose other than the recovery on the claim upon which the lien is based; and

(6) The sale, if conducted in the manner set forth in the application, would be conducted in a commercially reasonable manner.

Cal. Civ. Code § 3080.06(a)(1)-(6).

Section 3080.16(b) provides as follows:

Except as otherwise specified by order of the court, or as agreed to by all interested parties after the lien has arisen, the proceeds of sale shall be deposited with the clerk of the court in an interest-bearing account to abide the judgment in the action.

## C.   Factors Pursuant to California Civil Code § 3080.06

In determining whether to issue an order authorizing sale of livestock, the Court must assess the six factors set forth pursuant to Cal. Civ. Code § 3080.06(a).  The Court addresses each factor, in turn, below.

### 1.   Whether Plaintiff's Action Is Based on a Claim Giving Rise to a Livestock Service Lien

The first factor the Court must assess is whether JLG's action is based on a claim giving rise to a livestock service lien upon which an order for sale may issue. *Id.* § 3080.06(a)(1).  JLG asserts that all its causes of action seek damages for Excalibur's failure to pay JLG for provision of feeding, boarding, veterinary and general health care, and semen collection and storage services to Excalibur's bulls.  In general, the claims made are those that give rise to a livestock service lien pursuant to Section 3080.

JLG meets the definition of a livestock servicer as provided in the California Civil Code. *Id.* § 3080(b) ("'Livestock servicer' means any individual, corporation, partnership, joint venture, cooperative, association or any other organization or entity which provides livestock services.").  The

services provided by JLG are also encompassed by the definitions in the code.  *Id.* § 3080(c) ("'Livestock services' means any and all grazing, feeding, boarding, general care, which includes animal health services, obtained or provided by the livestock servicer, or his employee, transportation or other services rendered by a person to livestock for the owner of livestock, or for any person acting by or under the owner's authority.").  Excalibur does not dispute that JLG's claims give rise to a livestock service lien pursuant to Section 3080 upon which a sale order may issue.  The Court finds this factor is satisfied.

### 2.    The Probable Validity of JLG's Claims Against Excalibur

The second factor the Court must assess is whether JLG's claims have probable validity.  *Id.* § 3080.06(a)(2).  "A claim has 'probable validity' where it is more likely than not that the plaintiff will obtain a judgment against the defendant on that claim."  Cal. Civ. Proc. Code § 481.190.  While there is little case authority applying the provisions of Section 3080 *et seq.*, the Court finds that the requirements for authorization of a sale of livestock pursuant to a livestock service lien are very similar to the requirements for writs of attachment.

A writ of attachment is a creditor's remedy for the breach of a contract calling for the payment of money.  *Bringas v. Sullivan*, 126 Cal. App. 2d 693, 697 (1954).  In general, the effect of an attachment is to create a lien or encumbrance, or a quasi-lien of a limited nature on the property attached.  *See generally Investors Capital Corp. v. Schmidt*, 29 Conn. Supp. 444, 291 A.2d 284 (1972).  The property attached is then held to satisfy the judgment.  *See First Nat'l Bank of Balt. v. Corp. Comm'n of N.C.*, 161 Md. 508, 157 A. 748 (1932).

Pursuant to California law, a court will issue a writ of attachment if it finds (1) the claim upon which the attachment is based is one upon which an attachment may be issued, (2) the plaintiff has established the probable validity of the claim upon which the attachment is based, (3) the attachment is not sought for a purpose other than the recovery on the claim upon which the attachment is based, and (4) the amount to be secured by the attachment is greater than zero.  Cal. Civ. Proc. Code § 484.090(a).  In this context, the court determines the probable validity of the claim by "consider[ing] the relative merits of the respective parties and mak[ing] a determination of the probable outcome of the litigation."  *Loeb & Loeb v. Beverly Glen Music, Inc.*, 166 Cal. App. 3d

1110, 1120 (1985); *see also Interest Mortg. Inv. Co. v. Skidmore,* No. CIV. S-08-1543 LKK/DAD, 2008 WL 5385880, at *7 (E.D. Cal. Dec. 19, 2008) (noting that Section 484.090 speaks to the outcome of the litigation and not just a prima facie case).  As the language and the purpose of Section 3080.06 are similar to Cal. Civ. Proc. Code § 484.090(a), the Court will apply the analytical framework outlined in *Loeb & Loeb, supra,* to determine the probable validity of JLG's claims.  The Court will examine and consider the relative merits of the action and will make a determination of the probable outcome of the litigation.  *See Loeb & Loeb*, 166 Cal. App. 3d at 1120.  As with writs of attachment, this requires more than simply finding that JLG's claims have been pled with sufficient adequacy.  *Id.*  The Court must determine whether it is more likely than not that JLG will prevail on its claims.  Cal. Civ. Proc. Code § 481.190.

JLG asserts claims for (1) breach of livestock service agreement; (2) unjust enrichment; (3) account stated; (4) open book account; (5) work, labor, services, and materials received; (6) quantum meruit; and (7) enforcement of the livestock lien.  (Doc. 1-3.)  Each of these causes of action seeks damages or restitution for Excalibur's asserted failure to pay JLG for the services provided to Excalibur's livestock; therefore, each claim essentially flows from JLG's claim for breach of the livestock service agreement.

### a.    Claim for Breach of Oral Contract

"A cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Armstrong v. Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, 1391 n.6 (2004) (quoting *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 22 Cal. App. 3d 1371, 1399 (1990)).

JLG asserts that it has established a prima facie case that its claims are valid because the complaint is "verified" and supported by a signed affidavit of JLG's President, Jack Lerch, attesting to the validity of the claims.  (Doc. 14, 10:12-26.)  JLG concludes that "[b]ecause Defendant cannot reasonably dispute the foregoing facts, Plaintiff by virtue of its Verified Complaint has established

– as a presumptive matter of law – that it is likely to prevail on its claims at trial." [5] (Doc. 14, 11:1-3.)  To adequately consider whether JLG will more likely than not prevail on its contract claim, the Court assesses each element of JLG's breach of contract claim below.

### i.      Existence of Contract and JLG's Performance

Excalibur acknowledges that it has an oral agreement with JLG for livestock services that has been in place since 1994.    (Doc. 6, p. 14, ¶ 21.)  Therefore, the existence of a contract is essentially established. With regard to JLG's performance, the bulls are alive and in JLG's possession indicating that JLG has housed, fed, and serviced the animals.  (*See* Doc. 17, ¶ 8 ("JLG remains in possession of the subject cattle and continues to provide services to them.").)

### ii.     Excalibur's Breach

JLG asserts that Excalibur agreed to make monthly payments for the livestock services rendered to the bulls. (Doc. 17, ¶ 4.)  JLG contends that despite this agreement to make monthly payments, Excalibur has ceased making payments on its account entirely.  (Doc. 17, ¶ 6.)  Billing records indicate that Excalibur has not paid its account in full since January 2007 and has instead carried a balance forward each month since that date.  (Doc. 43-2, p. 3-11.)

Excalibur acknowledges that it has an outstanding balance with JLG for services rendered to livestock it contracted to board at JLG's facilities. (*See, e.g.,* Doc. 24, 2:15 (opposition stating that "ultimately, Excalibur fell behind in boarding charges"), Doc. 28, ¶ 8 (David Winkels' testimony that "any of the other bulls listed in Exhibit 'F' would more than satisfy Excalibur's outstanding balance with JLG if sold").)  Excalibur claims, however, that it has fully performed its obligations under the contract and, to the extent it has not, it was excused of its obligations by JLG's failure to provide veterinary and health services to the bulls.  (Doc. 6, p. 16, ¶¶ 31-32.)  Specifically, Excalibur asserts that JLG breached the agreement by failing to provide appropriate veterinary care to a bull named Bojangles who died on August 31, 2007.  (Doc. 6, p. 16, ¶ 32.)

"When a party's failure to perform a contract obligation constitutes a material breach of the

---

[5] JLG offers no case law or statutory support for the proposition that a sworn affidavit presumptively establishes the validity of its claims.  Further, the complaint is not signed by JLG or its representative.  (*See* Doc. 1-3, p. 9.)  Jack Lerch, however, filed a sworn affidavit in support of the allegations of the complaint and the application for an order authorizing sale of the livestock.  (Doc. 1-3, p. 20-40; Doc. 17.)

contract, the other party may be discharged from its duty to perform under the contract." *Brown v. Grimes*, 192 Cal. App. 4th 265, slip. op. at *7 (Jan. 27, 2011). Where the breach is total, the non-breaching party is entitled to repudiate the entire contract. *Sackett v. Spindler*, 248 Cal. App. 2d 220, 229 (1967). On the other hand, if the breach is not total, the non-breaching party is not entitled to consider himself discharged, and refusal to perform under the contract is unlawful repudiation that can, in turn, constitute a total breach sufficient to discharge the first party. *Id.*

It appears from billing records that Excalibur's account was paid in full on January 29, 2007, and Excalibur's failure to pay its account in full each month began in February 2007. (Doc. 43-2, p. 3.) As a result, JLG began to apply finance charges to the account in August 2007. (Doc. 43-2, p. 4.) Excalibur alleges that Bojangles died on August 31, 2007; thus, Excalibur's failure to pay its account in full appears to have pre-dated JLG's alleged breach to provide adequate veterinary services to Bojangles resulting in his death. Further, it does not appear that the failure to provide adequate veterinary services to one bull is a total and material breach of the contract.[6] It does not appear that Excalibur will be excused from its performance due to a breach on the part of JLG. The Court finds that it is more likely than not that JLG will be able to establish Exclaibur breached the livestock services agreement by its failure to pay the amount due.

### iii.   Damages to JLG

JLG's billing statements present evidence of the damages suffered by JLG. As of December 31, 2010, the total balance due on Excalibur's account, including applicable fees and interest, was $241,017.30. (Doc. 43-2, p. 11.) The amount of the damages is disputed by Excalibur (Doc. 23, ¶¶ 9-10 ("There was no agreement that there would be any charges beyond the reasonable boarding fee and veterinarian expenses; there was no agreement that there would be any interest charges or '[s]ervice charges' associated with past due amounts")), but Excalibur has already acknowledged an outstanding balance and, therefore, the existence of damages to JLG is established.

---

[6] The materiality of failing to fully perform a promise is determined on consideration of these factors: (1) the extent to which the injured party will obtain the substantial benefit that he could have reasonably anticipated; (2) the extent to which the injured party may be adequately compensated in damages for the lack of complete performance; (3) the extent to which the party failing to perform has already partly performed or made preparations for performance; (4) the greater or less hardship on the party failing to perform in terminating the contract; (5) the willful, negligent, or innocent behavior of the party failing to perform; and (6) the greater or less uncertainty that the party failing to perform will perform the remainder of the contract. *Sackett*, 248 Cal. App. 2d at 229.

### b.  Novation or Accord and Satisfaction

Excalibur asserts in its counterclaim that JLG breached the livestock service agreement by refusing to fulfill orders for semen submitted by Excalibur or third parties pursuant to their June 2010 agreement.  (Doc. 6, p.15-16, ¶¶ 29-34; Doc. 24, p. 2.)[7]  To the extent that Excalibur asserts that it procured a new agreement with JLG in June 2010 that was a novation or an accord and satisfaction of the original agreement, this is not convincing given the present information before the Court.

Accord and satisfaction is the substitution of a new agreement for and in satisfaction of a pre-existing agreement between the same parties. *Moving Picture etc. Union v. Glasgow Theatres, Inc.*, 6 Cal. App. 3d 395, 402 (1970).  The accord is the agreement by one party having a right against the other arising out of an existing agreement to accept from the other party something in satisfaction of that right that is different from, and usually less than, that which might have been recovered under the original obligation. *Id.* at 403.  It appears that the understanding reached between JLG and Excalibur in June 2010 was a new and separate agreement regarding the future shipment of semen given the outstanding balance of Excalibur's account and was not in satisfaction of the Excalibur's obligation.  Excalibur's payment of $4,490 to Excalibur on June 28, 2010, to secure shipment of semen can hardly be considered a satisfaction of a $152,505.55 debt that was due and owing prior to the payment of the $4,490.  (*See* Doc. 43-2, p. 10.)  Moreover, Excalibur does not claim that the $4,490 was intended as satisfaction of the original contract for livestock services.

Nor does the June 2010 understanding between JLG and Excalibur appear to be a novation of the original oral contract regarding services for the bulls.  Cal. Civ. Code § 1530 ("Novation is

---

[7] As explained, *infra*, David Winkels states in his declaration that he discussed Excalibur's outstanding balance with Larry Gerber of JLG on June 18, 2010.  They purportedly reached an agreement that if JLG would fill and ship certain semen orders that Excalibur asked to be shipped then Excalibur would pay $4, 490. (Doc. 23, ¶ 13-14.) The July 2010 invoice from JLG reflects that Excalibur paid $4,490 to JLG on June 29, 2010.  (Doc. 17-1, Exhibit B, at 5.) Mr. Winkels also asserts that he and Mr. Gerber agreed that for orders of semen that were placed after June 18, 2010, Excalibur would pay JLG $1 per unit sold that was in inventory at the time of the agreement, and $2 per unit for semen collected that was *not* in inventory at the time of the agreement.  (Doc. 23, ¶ 16.)

Mr. Winkels asserts that, although six orders were placed for semen prior to the agreement, only three orders were actually shipped.  Mr. Winkels contends that, despite this agreement, once Excalibur paid the agreed upon $4,490, Mr. Gerber informed him that JLG would not ship the semen as previously agreed.  Without such sales of semen, Excalibur claims it cannot generate any income to pay the boarding fees.  Thus, the failure of JLG to honor the agreement reached on June 18, 2010, prevents Excalibur from paying the servicing fees now due and owing.

the substitution of a new obligation for an existing one."); *Olympic Fin. Co. v. Thyret*, 337 F.2d 62, 65 (9th Cir. 1964) (finding novation is based upon the fact pattern of a particular case).  In *Young v. Benton*, 21 Cal. App. 382, 384 (1913), the court determined that novation implies the four following essential requisites:  (1) a previous, valid obligation; (2) the agreement of all parties to the new contract; (3) the extinguishment of the old contract; and (4) the validity of the new one.  Here, there is no indication that the original contract was extinguished because the terms that Excalibur alleges were negotiated relate only to the sale and shipping of semen, rather than alteration of the original livestock service agreement or the terms or payment under that contract.

### c.    Conclusion

JLG has adequately established each element of its breach of contract claim.  While the evidence before the Court is limited because discovery has not commenced and the case is in its earliest stage, the Court finds that it is more likely than not that JLG will prevail on its breach of contract claim.  Therefore, JLG's claim has probable validity.  As the remainder of the claims flow from the breach of contract claim, there is no need to analyze JLG's probability of success on those claims.

The Court reiterates that none of these findings is binding for purposes of a determination on the merits nor are any findings dispositive conclusions relating to any issue or claim.  Any findings made herein are for the limited purpose of assessing the probable validity of JLG's claims under Section 3080.06.

### 3.    Whether JLG Has Established Probable Validity of the Lien Sought to Be Enforced by Sale

Section 3080.06 of the California Civil Code requires that the Court consider whether JLG, as the lienholder, has established the probable validity of the lien sought to be enforced by sale.  Cal. Civ. Code § 3008.06(a)(3).

Excalibur asserts that it does not own the bulls that JLG is seeking authorization to sell, and therefore implies that JLG's lien against the livestock is not valid.[8]  Generally, a lien against livestock will not arise where someone without the authority of the owner contracts for the livestock services.

---

[8] Excalibur does not explicitly argue that ownership of the bulls invalidates JLG's lien.  However, lack of owner consent to the livestock services procured may invalidate a lien.

*Lowe v. Woods*, 100 Cal. 408 (1893).  In *Lowe*, the California Supreme Court examined the validity of a lien arising under California Civil Code Section 3051.[9]  The defendant, Woods, contracted to purchase a horse from the owner of the horse, Adams.  *Id.* at 409.  Woods and Adams agreed that Woods would use the horse and be responsible for the care of the animal, but title would remain with Adams until such time as Woods paid Adams the total purchase price for the horse.  *Id.*  Woods and Adams also expressly agreed that Woods would care for the horse without cost or expense to Adams and that, if Woods failed to pay the entire purchase price, the animal would be delivered back to Adams without cost or expense.  *Id.* at 409-10.  Woods then placed the animal in the care of the plaintiff, Lowe, a stable keeper, agreeing to pay Lowe $20 per month for the care and feed of the animal.  *Id.* at 409.  Following Woods' failure to pay Lowe for the services to the horse, Lowe foreclosed on the livestock lien, and the trial court ordered the sale of the horse.  *Id.* at 409-10.

Adams appealed the judgment of the trial court.  *Id.* at 410.  On appeal, the California Supreme Court determined that no lien against the horse arose in favor of Lowe.  The court reasoned as follows:

> At the time Woods placed the horse in the custody of [Lowe], defendant Adams was the owner.  The title was in her; the court so found under the agreement, and authority in law is not lacking to support the finding.  Adams being the owner of the horse, without her assent Woods could not sell it; he could not pledge it; neither had the power to create a lien upon it by placing it in the hands of the agistor.  Without any contract upon [Adams'] part, without any personal liability whatever, without her assent in any form, and even without any notice to her of the facts which are claimed to have created the lien, it is now sought to take her property and apply it to the satisfaction of Woods' debt.  Such a practice would be violative of the fundamental principle of law that no man's property can be taken from him without his consent.

*Id.* at 412.

In *McTigue v. Arctic Ice Cream Supply Co.*, 20 Cal. App. 708 (1912), a California appellate court applied *Lowe* in determining that a lien against livestock placed with a livestock servicer by the lessee of livestock was not valid against the owner of the livestock.  In that case, Arctic Ice Cream Supply Company ("Arctic") leased all its real and personal property "and the ice cream business of the corporation" to George W. Morse ("Morse").  Subsequently, the plaintiff, a livery

---

[9]  The livestock lien was originally codified at California Civil Code § 3051.  Section 3051 was repealed, and the livestock lien was amended and recodified at Section 3080, *et seq.*

stable proprietor, provided services for horses owned by Arctic, but leased to Morse. The plaintiff was not paid for these services and sought to collect against both Arctic and Morse through a civil action. In concluding that the plaintiff was not entitled to a lien against Arctic's property (the livestock), the court reasoned as follows:

> While it is not disputed that plaintiff rendered the services upon which his claim of lien was founded, the evidence upon the whole case shows without conflict that plaintiff's contract for the care and keep of the horses and other property upon which a lien was claimed was made solely with defendant Morse. Plaintiff was fully informed of the existence of the lease from the corporation defendant to the defendant Morse, and knew that, under the terms of the lease, Morse had no authority to incur debts against the corporation defendant or its property. That the plaintiff knowingly gave credit solely to Morse, and did not look to the corporation defendant or its property for the payment of the claim in controversy, is evidenced by plaintiff's statement to that effect which was made at a stockholders' meeting of the corporation, when the subject of Morse's care and keep of the corporation property was under discussion. Plaintiff's knowledge of the fact that Morse was only the lessee of the property in question without authority to incur debts against the corporation or to create a lien against its property, brings the present case squarely within the rule declared in the case of [*Lowe*], where it was said, in effect, that the lien provided by Section 3051 of the Civil Code can be created only by the act of the owner of the property sought to be charged, or by the act of a person duly authorized to act for the owner.

*Id.* at 717-18.

In light of *Lowe* and *McTigue*, Excalibur's ownership of the bulls at issue or Excalibur's authorization by owners of the bulls to incur service fees for care and boarding, is relevant in considering the probable validity of JLG's livestock lien as to these bulls.

To be clear, as it relates to this motion, the Court is not tasked with making conclusive findings as to the validity of JLG's livestock lien or the merits of the action; for purposes of issuing an order authorizing the sale of livestock, the Court must instead consider whether JLG's asserted lien has *probable validity*. Cal. Civ. Code § 3080.06(a)(3).

### a.    Consideration of Evidence

Both parties have submitted various evidence to support their respective positions regarding the ownership of the bulls that JLG seeks to sell. JLG submitted pedigree records from the Holstein Association that appear to indicate that Excalibur is the owner of the 30 bulls JLG seeks to sell. At the January 26, 2011, hearing, Excalibur claimed that these records were hearsay and objected to the Court's consideration of that evidence asserting the following:

> The issue as far as the Holstein pedigree is concerned, I – for the record, I have an objection to the introduction of those documents simply because I think they're hearsay, they lack foundation. There's no indication that – as to how these documents were prepared for what they're intended to show.
>
> I will represent to the Court that there is a document that's issued by the Holstein Association of the USA which is entitled, "Certificate of Registration." That particular document shows who the owner is.

(Doc. 32, 17:4-13.)

Following the hearing, Excalibur produced lease documents related to some of the bulls at issue (*see* Docs. 34-1, 38-1, 39-1) and a "Sire Development Agreement" that appear to indicate that some bulls JLG seeks to sell are not owned by Excalibur (*see* Doc. 35-1). JLG has objected to this evidence on various grounds including hearsay, lack of foundation, violation of the best evidence rule, and that the Sire Development Agreement is irrelevant to show ownership of the bulls. (Doc. 45.) In response to Excalibur's filing, JLG produced the Certificates of Registration from the Holstein Association for each of the bulls it proposes to sell. (Doc. 44-1.) The Certificates of Registration, asserted by Excalibur's counsel at the January 26, 2011, hearing to be dispositive of ownership, indicate that Excalibur is the owner of each of the 30 bulls at issue. (Doc. 44-1.)

Both parties have objected to the evidence offered by the other. The Court finds that the evidence is inadmissible in its current form for use at trial. The pedigree records submitted by JLG are hearsay, and no exception has been set forth for their admissibility. The Certificates of Registration submitted by JLG are problematic.[10] Regardless of whether the documents constitute hearsay or whether they are subject to a hearsay exception, the Certificates of Registration state they

---

[10] JLG provided a declaration from a custodian of records from the Holstein Association (Doc. 44) in support of its assertion that the records are subject to the business records exception to the hearsay rule. A writing is admissible as a business record under Fed. R. Evid. 803(6) if it is (1) prepared at or near the time of the event recorded, (2) recorded in the regular course of business and it is the regular practice of the business to make such a record, and (3) recorded by one with personal knowledge of the information recorded. *Clark v. City of L.A.*, 650 F.2d 1033, 1036-37 (9th Cir. 1981) (citing Fed. R. Evid. 803(6)). These facts must be proven through the testimony of a custodian of records or other qualified witness, though not necessarily the declarant. *United States v. Ordonez*, 737 F.2d 793, 805 (9th Cir. 1984) The records will not be admissible, however, if the source of information or the circumstances of preparation indicate a lack of trustworthiness. *Id.*

Here, the source of information for the Certificates of Registration appears to lack the appropriate indicia of trustworthiness and reliability necessary for the application of a business records exception. The records are generated through information voluntarily provided by members of the Holstein Association seeking to register their animals. (Doc. 44-1, p. 2.) Further, there is no indication that the person who records the information has personal knowledge of the recorded information.

are not to be used as guarantees of ownership of the animal to which the record relates:

> The animal described by this certificate has been accepted for registration with the Holstein Association USA, Inc.  This certificate is issued in full reliance upon the statements in the application for registration.  In no event is this certificate a guarantee by the Association of the breeding or ownership of the animal or any other information in this document.  The registration may be corrected or expunged from the records of the Association as authorized by the Bylaws of the Association.

(*See, e.g.,* Doc. 44-1, at 2.)[11]

Moreover, the lease agreements and Sire Development Agreement proffered by Excalibur constitute inadmissible hearsay to the extent they are offered for the truth of the matter asserted therein – that the bulls are leased by Excalibur from others.  Excalibur has not properly set forth an applicable exception to the hearsay rule.

Nonetheless, the parties have neither argued nor cited relevant case authority that the Court is prohibited from considering inadmissible evidence related to JLG's non-dispositive motion.  While courts are generally constrained to consider only admissible evidence in the context of summary judgment motions, *see, e.g., Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665 (9th Cir. 1980), this is not universally applicable with regard to non-dispositive motions filed early in the proceedings.  For example, the Ninth Circuit has held that inadmissible evidence may be considered in conjunction with a motion for a preliminary injunction.  *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial.  The court may give even inadmissible evidence some weight . . . .").  Citing *Harvey*, at least one district court has also considered inadmissible evidence in the context of a motion to dismiss on forum non conveniens grounds.  *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1134, 1144 (C.D. Cal. 2005) ("Since a determination regarding dismissal on the basis of forum

---

[11] Highlighting the unreliability of the Certificates of Registration as proof of ownership, the Court notes that a lease document provided by Excalibur states the following with regard to "Certificates of Registry":

> 11.  Certificates of Registry.  Sire Owner shall transfer the Certificate of Registry on the Sire to Excalibur effective as of the date of this Agreement.  It is understood that this action shall not transfer legal title of the Sire to Excalibur, but allows Excalibur free access to records concerning the Sire and its progeny, and is necessary for effective marketing because it identifies the Sire's semen as being available through Excalibur.

(Doc. 39-1, ¶ 11.)

non convienens should be made early in the litigation and there will have been little discovery, the court should not be restricted in considering only admissible evidence.")

In many cases where courts have exercised discretion to consider inadmissible evidence related to non-dispositive motions, they have reasoned that the posture of the motion filed so early in the proceedings leaves parties with little opportunity to perform discovery and obtain admissible evidence to support their positions. *See Mujica*, 381 F. Supp. 2d at 1144; *Rosen Entm't Sys., LP v. Eiger Vision*, 343 F. Supp. 2d 908, 912 (C.D. Cal. 2004) (citing *Harvey* and determining that inadmissible evidence offered by defendant opposing motion for preliminary injunction may be considered by the court); *Martinez v. Schwarzenegger*, No. C 09-02306 CW, 2009 WL 1844989, at *3 n.4 (N.D. Cal. June 26, 2009). The Court finds this reasoning applicable to JLG's motion for an order authorizing the sale of livestock. This motion was filed early in the litigation before either party had an opportunity to pursue discovery. Further, in contrast to a summary judgment motion and similar to a motion for a preliminary injunction, JLG's motion has no potential to resolve the case on its merits. Therefore, in its discretion the Court will consider the evidence offered by both parties, despite its current inadmissibility for purposes of trial.

### b. Ownership Issues Do Not Impact the Probable Validity of JLG's Livestock Lien

Although the parties have vigorously disputed the ownership of the 30 bulls JLG seeks to sell, neither party has clearly articulated why ownership of the bulls precludes or warrants the authorization to sell sought by JLG. Excalibur appears to contend that ownership dictates who should receive notice of any authorized sale. JLG continues to maintain that it seeks only to sell Excalibur's bulls. In light of *Lowe* and *McTigue*, *supra*, however, the Court finds that ownership of the livestock or authorization of the owner of the livestock regarding the livestock services may impact the validity of a livestock service lien. Thus, the Court considers the issue of ownership below.

First, with regard to 12 of the 30 bulls that JLG seeks to sell, Excalibur has presented no

evidence that ownership lies with anyone other than Excalibur.[12]   Conversely, JLG has submitted evidence from the Holstein Association indicating that the bulls at issue are owned by Excalibur. While the Court questions the reliability of the Certificates of Registration provided by JLG, as discussed, *supra*, Excalibur has not provided any evidence to dispute these Certificates of Registration even though Excalibur is in the best position to have documentary proof of ownership of the bulls.

Although Excalibur was given additional time to supplement its pleadings, it did not, for example, provide any declarations from any purported owners of the bulls corroborating its claim of ownership – or its lack thereof.   None of the leases or the Sire Development Agreement offered by Excalibur as evidence of ownership relates to these 12 bulls.   Moreover, with regard to the bulls named Eskdale Momentous-ET and Hnkes-Wessel Enforce-TW, Excalibur expressly claimed ownership of these bulls in its counterclaim against JLG.   (*See* Doc. 6, ¶ 49(f), (q).)   "Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them." *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) (citing *White v. Arco/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir. 1983)). Therefore, the Court cannot conclude that ownership of these 12 bulls lies with anyone other than Excalibur and finds that the lien as to these 12 bulls has probable validity.

With regard to the remaining 18 bulls, Excalibur has produced purported leases and a Sire Development Agreement that it asserts is evidence that it does not own these 18 bulls.   With regard to 2 of the 18 bulls referenced in the leases or the Sire Development Agreement, the ownership information is in conflict with Excalibur's allegations in its counterclaim.   Specifically, in Excalibur's counterclaim, it alleges that it is the owner of the bulls named Regancrestdl S Ryker – ET, Registration No. 61898421, and E-Evans-A Allen Rascal – ET, Registration No. 62613542.   (Doc. 6, ¶ 49(j) and (o).)   However, the documents Excalibur now provides indicate that Regancrestdl S Ryker – ET and E-Evans-A Allen Rascal are owned by Gale Hoese dba Hoese Investment Group.

---

[12]  These 12 bulls include the following: (1) Our-Favorite Shyster-ET; (2) Eskdale Momentous-ET; (3) Henkeseen Exotic-ET; (4) Henkeseen Expression-ET; (5) Regancrest PR Bloker-ET; (6) Regancrest Mac Bence-ET; (7) Regancrest Mac Benat-ET; (8) Bonaccueil Duplicate; (9) Ralma Mac Granite-ET; (10) Hnkes-Wessel Emmitt-TW; (11) Hnkes-Wessel Enforce-TW; and (12) Sonnek Damion Archmedes-ET.

(Doc. 38-1, p. 1 and Doc. 35-1, respectively.)  Excalibur's claims of ownership in its counterclaim constitute judicial admissions, unless amended.  *See Lacelaw Corp.*, 861 F.2d at 226.  Thus, the Court concludes that JLG's lien has probable validity with regard to the bulls named Regancrestdl S Ryker–ET and E-Evans-A Allen Rascal.

With regard to the last 16 bulls, to the extent that the leases and Sire Development Agreement do not contradict the allegations of Excalibur's counterclaim, they reflect that Excalibur has authority of the owners to house the subject bulls in any way Excalibur deems necessary – which includes housing the animals with JLG.  Both the language of the California Civil Code and the applicable case law acknowledge that a valid lien may arise where the person who arranged for the livestock services did so with the authority of the owner of the livestock.  *See* Cal. Civ. Code § 3080(c) (livestock services means any and all grazing, feeding, boarding, general care obtained or provided by the livestock servicer "rendered by a person to livestock for the owner of livestock, *or for any person acting by or under the owner's authority*") (emphasis added).

This is exemplified by *Lowe* and *McTigue* where the analysis hinged on whether or not the respective owners authorized the livestock services and the extent to which the person who sought the livestock services was able to bind the owner of the livestock to any indebtedness arising out of those services.    In *McTigue*, the court explained the lien was invalid because, while the lessee possessed, used, and occupied the business property (which included the livestock), the contract with the lessor corporation expressly indicated that the lessee had no authority to bind the corporation, the livestock servicer knew of the terms of that lease and knew that the lessee had "no authority whatsoever to incur debts of any kind for or on behalf of the defendant corporation."  20 Cal. App. at 713.  In *Lowe*, the court found it pivotal that Woods expressly agreed that the owner of the livestock would incur no expenses as a result of Woods taking on the horse and that, if Woods did not ultimately purchase the horse, it would be returned to the owner without any costs or expenses.  100 Cal. at 409-10.

Here, unlike *Lowe* and *McTigue*, the lease agreements and Sire Development agreement  do not contain an express provision that Excalibur may not encumber the livestock for servicing fees at the owners' expense.  Rather, the documents state that "Excalibur shall have the authority to

transport and house the Sire in any location it deems necessary to optimize semen production and marketability." (*See, e.g.,* Doc. 34-1, p. 8.)  The fact that Excalibur may be a lessee contracting for the boarding and care of the lessors' bulls does not prevent a valid lien from arising against the livestock where the owners gave Excalibur permission to board the animals and incur the costs of that boarding and care.  Further, certain leases even reflect that the purported owners specifically agreed that the housing of the bulls would be provided by JLG, and the owner would pay for those services.  (Doc. 38-1, ¶ 10; Doc. 38-1, p. 9.)

Moreover, the terms of the leases indicate that (1) Excalibur has possession of the bull for the entire term of the lease (Doc. 34-1, p. 3 ¶ 3; Doc. 34-1, p. 6 ¶ 3; Doc. 35-1, ¶ 3; Doc. 38-1, ¶ 3; Doc. 39-1, ¶ 3), (2) the lease is to last until the death of the bull unless Excalibur terminates the lease at an earlier time (Doc. 34-1, p. 7, ¶ 9; Doc. 35-1, ¶ 7; Doc. 38-1, ¶ 7; Doc. 39-1, ¶ 9), (3) Excalibur has the authority to transport and house the bulls in any location deemed necessary for production and marketability (Doc. 34-1, p. 8, ¶ 13; Doc. 35-1, ¶ 10; Doc. 38-1, ¶ 10; Doc. 39-1, ¶ 13), and (4) the owner of the bull gives up the ability to sell, transfer, or otherwise dispose of the right, title, or interest in the bull without Excalibur's permission and subject to the lease (Doc. 34-1, p. 7, ¶ 10; Doc. 35-1, ¶ 8; Doc. 38-1, ¶ 8; Doc. 39-1, ¶ 10).  These leases are much broader than the lease in *McTigue* or the agreement between Adams and Woods in *Lowe*.  Here, the owners have agreed to give up most essential ownership rights including the right to sell or transfer the interest in the bull without the permission of Excalibur and, even then, any transferee would be subject to the terms of the lease.  Neither of the owners in *McTigue* or *Lowe* gave up such rights.  Further, the leases indicate that Excalibur had at least tacit authorization, in certain cases express authorization, from the owners to board and house the bulls with JLG.

Furthermore, unlike the plaintiff in *McTigue*, JLG maintains that it had no knowledge of any of these purported leases.  In *McTigue*, the court noted that the livestock servicer provided the services with knowledge that the lessee had no ability to encumber the lessor corporation for any services provided.  20 Cal. App. at 713 ("plaintiff at all times had full knowledge of the terms of the lease . . . and [that Morse] had no authority whatsoever to incur debts of any kind for or on behalf of the defendant corporation").  JLG maintains that it previously understood that Excalibur owned

all 30 of the bulls JLG seeks to sell; in other words, JLG claims it did not know prior to Excalibur's opposition that any of the 30 bulls were owned by anyone other than Excalibur. (*See* Doc. 32, 6:21-25 - 7:1 ("The bulls which we know Exclaibur leases were not the subject of this motion . . . until we received [Excalibur's] opposition we were under the impression that there was no issue regarding the ownership of these [30] bulls.").)  This is in contrast to *McTigue* where the plaintiff not only knew about the ownership of the livestock, but knew that the lessee had no ability to bind the corporation for any debts arising out of services to that livestock.

Finally, Excalibur asserts in its supplemental brief that the owners are entitled to notice of any sale of the bulls, but it does not explicitly challenge the validity of the lien.  To the extent that the leases and Sire Development Agreement indicate that Excalibur is not the owner of the livestock at issue, the documents appear to provide Excalibur with the authority to encumber the animals for their housing and care.  This is predicated not simply on the breadth of Excalibur's rights under the leases or the Sire Development Agreement, but also by the express provision allowing Excalibur to house the livestock wherever and however it deems best.  The Court finds, therefore, that as to the remaining 16 bulls, Excalibur procured the livestock services at issue with the owners' authorization.

JLG has established through invoices that Excalibur has a past due balance for services for livestock rendered to the bulls that JLG proposes to sell.  Excalibur does not dispute that there is a past due balance for livestock services.[13]  For all the foregoing reasons, the Court finds that it is more likely than not that the lien against the 30 bulls sought to be enforced by sale is valid.  *See* Cal. Civ. Code § 3080.06(a)(3).

**4.  Whether the Sale Is Necessary to Prevent a Possible Decline in Value or Condition of the Livestock or That the Sale Should Be Held in the Interest of Equity**

JLG argues that there is a possibility that pending a final judgment, the livestock may become sick, infirm, or die, diminishing or eliminating JLG's source of collateral for its lien.  (Doc. 14, 11:25-26.)  It is plausible that the value and condition of the livestock may decrease over time while JLG's claims are litigated before the Court.

---

[13] It appears that Excalibur disputes the aggregate total due on its account with JLG.  For example, Excalibur asserts that finance or service charges assessed to its account were not part of the oral agreement.  (Doc. 23, ¶¶ 9, 10.)

1    Excalibur asserts that the sale should *not* be held in the interests of equity.  It asserts that JLG

2    has wrongfully breached a modified agreement that JLG and Excalibur reached in approximately

3    June 2010 regarding the boarding of the animals and shipment of the bulls' semen.   In his

4    declaration, David Winkels states that he discussed Excalibur's outstanding balance with Larry

5    Gerber of JLG on June 18, 2010, and they purportedly reached an agreement that, if JLG would fill

6    and ship certain semen orders, JLG would be paid $4,490.  (Doc. 23, ¶ 13-14.)  The July 2010

7    invoice from JLG reflects that Excalibur paid $4,490 to JLG on June 29, 2010.  (Doc. 17-1, Exhibit

8    B, p. 5.) Mr. Winkels also asserts that he and Mr. Gerber agreed that for orders of semen placed after

9    June 18, 2010, Excalibur would pay JLG $1 per unit sold that was in inventory at the time of the

10   agreement and $2 per unit of semen not in inventory at the time of the agreement.  (Doc. 23, ¶ 16.)

11        Mr. Winkels asserts that, although six orders were placed for semen prior to the agreement,

12   only three orders were actually shipped.  Mr. Winkels contends that, despite this agreement, once

13   Excalibur paid the agreed-upon $4,490, Mr. Gerber informed him that JLG would not ship the semen

14   as previously agreed.  Without such sales of semen, Excalibur claims it cannot generate any income

15   to pay the boarding fees.  Thus, the failure of JLG to honor the agreement reached on June 18, 2010,

16   prevents Excalibur from paying the servicing fees now due and owing.  For this reason, Excalibur

17   asserts that it is not equitable for the Court to authorize sale of the bulls.

18        This factor requires the Court to determine whether a sale is necessary for some practical or

19   equitable reason, not whether the sale should be halted for equitable reasons.  In other words, the

20   language of the Civil Code does not require that the Court balance or account for the hardships or

21   equities with regard to each of the parties.  Even assuming *arguendo* that the Court were required

22   to consider *halting* the sale on equitable grounds, the agreement reached between JLG and Excalibur

23   appears to be a new agreement regarding the shipment of certain semen, not an agreement that

24   altered the original oral contract.  To the extent that Excalibur is asserting it is not equitable to

25   enforce the lien based on the original agreement because a later and separate agreement was not

26   honored by JLG, this argument is not persuasive.  Here, with each day passing, JLG sustains

27   additional damages for servicing and housing the bulls. (Doc. 14, 8:13-28 - 9:1-4; Doc. 43, 6

28   ("maintaining the subject bulls is approximately $194.70 per day").)  JLG has a duty to attempt to

mitigate continuing damages. *Valle de Oro Bank v. Gamboa*, 26 Cal. App. 4th 1686, 1691 (1994). Further, as more time passes, the animals age and their potential resale value may diminish or they may become sick or require even more extensive veterinary care, which again increases the costs JLG will sustain. (Doc. 14, 8:25-26.) Under these circumstances, JLG has established that the bulls' value or condition may diminish prior to the sale and that mitigation of continuing damages through a sale is necessary.

Finally, Excalibur's assertion at the January 28, 2011, hearing that JLG is required to show great or irreparable injury under code is incorrect. Great or irreparable injury must be shown where the order authorizing sale is sought without a noticed hearing. California Civil Code § 3080.15(a) provides the following:

> Except as otherwise provided by statute, *or upon noticed hearing as provided in this chapter*, no order authorizing sale or order for substitution of undertaking for livestock may issue unless it appears from facts shown by affidavit that great or irreparable injury would result to the party seeking the order if the issuance of the order were delayed until the matter could be heard upon noticed hearing.

This matter was set for hearing upon noticed motion, a hearing was held on January 28, 2011, where both parties had the opportunity to be heard, and the parties were given an additional opportunity to submit supplemental briefs related to the issues. The "great or irreparable injury" showing necessary under Section 3080.15(a) is not applicable under these circumstances.

**5.     Whether the Sale Is Being Sought for Any Purpose Other Than to Satisfy JLG's Lien**

Although Excalibur asserts in its counterclaim that JLG is trying to destroy its business (Doc. 6, p. 15, ¶ 27-28), JLG maintains that it is simply trying to recoup some of the losses sustained from servicing the bulls without payment. There is no evidence in the record, other than Excalibur's belief, that there is any motivation for the sale other than satisfying the lien. This factor is satisfied.

**6.     Whether the Sale Will Be Conducted in a Commercially Reasonable Manner**

JLG has proposed that the sale be conducted by a licensed auctioneer at JLG's place of business. JLG has provided declarations from Ken Melvold, a licensed and bonded auctioneer. (Doc. 15.) Mr. Melvold states that he has reviewed the pedigree information available for each of the bulls, and he estimates that the total value of the 30 bulls JLG seeks to sell ranges from

1   $49,000.00 to $148,500.00.  (Doc. 15, ¶¶ 3, 4.)

2          JLG has also provided a declaration of Wayne Glaeser in support of the application for sale.

3   Mr. Glaeser has extensive experience in livestock genetics and has been in the cattle industry for

4   over 30 years.  (Doc. 16, ¶¶ 1-2.)  He has personally inspected the bulls at their subject location and

5   reviewed the pedigree information for each animal, and he provides an estimate for each animal's

6   fair market value.  (Doc. 16, ¶ 5.)  Mr. Glaeser also states that having the auction at JLG's facility

7   where the animals are housed is important for the health of the animal and will reduce transportation

8   costs that would be incurred in moving the bulls to another auction site.  (Doc. 16, ¶ 8.)  Mr. Glaeser

9   opines that JLG has acted in a commercially reasonable manner in seeking to hold the proposed sale

10  at JLG's facility in Oakdale, California.  (*Id*.)  This factor is satisfied.

11  **D.   Conclusion**

12         For all the foregoing reasons, the Court finds that JLG has established the necessary factors

13  pursuant to California Civil Code § 3080.06(a) entitling it to an order authorizing sale of livestock.

14  **E.   Notice of the Sale**

15         Pursuant to the California Civil Code, notice of the sale of livestock must be provided as

16  follows:

17         (a) A notice in writing of the date, time and place of sale shall be delivered personally
           or be deposited in the United States mail, postage prepaid, addressed to the owner of
18         the livestock, at his last known address, and to any other person claiming a lien upon
           or security interest in the livestock, who had on file with the California Secretary of
19         State on the date the lien arose a financing statement covering the livestock for which
           livestock services secured by the lien were provided at least five days before the date
20         fixed for any public sale or before the day on or after which any private sale or other
           disposition is to be made.

21
           (b)  Notice of the time and place of a public sale shall also be given at least five days
22         before the date of sale by publication once in a newspaper of general circulation
           published in the county in which the sale is to be held.  If there is no such newspaper,
23         notice shall be given by posting, for five days prior to sale, a notice of sale where the
           sale is to be conducted.

24
    Cal. Civ. Code § 3080.17(a)-(b).  Excalibur asserts that JLG has not provided proper notice of the

25  sale to any of the other owners of the bulls.  As the sale has not yet been approved, JLG has not set

26  a date for the sale.  Thus, complete notice of the sale could not be given to anyone prior to this order.

27  While the sale has been advertised by JLG on the commercial advice of the auctioneer, no date was

28  advertised.  Once a date is selected for the sale, notice must be furnished.  The Court finds that it is

appropriate that the purported owners of the bulls be provided notice of the sale that comports with Section 3080.17(a)-(b). Written notice of the sale ("Notice") shall be provided to the following individuals/entities:[14]

1.      Excalibur Sires, 1815 Summit Drive N.E., Rochester, Minnesota, 55906;[15]

2.      Lesperron Holsteins, Route 108, Bury Quebec, JOB 1BO, Canada;

3.      Steven Gillens, P.O. Box 126, Minersville, Utah, 84752;

4.      Gale Hoese, dba Hoese Investment Group, 12058 Cnty Rd. 2, Glencoe, Minnestoa, 55336; and

5.      Kevin Jimerson and Kick-It-Up Holsteins, c/o Jeff and Lisa Gibson, 4486 Jackson Rd., Eminence, Kentucky, 40019.

*See id.*

Prior to issuing the Notice, JLG must submit the proposed Notice to the Court for approval. Once the Notice has been approved, JLG may proceed to send the Notice, via First Class U.S. Mail, to the individuals/entities identified above. This Notice shall be served 30 days prior to the sale and shall be accompanied by a copy of this order. While the noticed individuals may choose to do nothing, the notice period will provide them an opportunity to oppose JLG's lien rights by joining this action, or alternatively, they may discharge the lien by paying the full amount of the past services fees that are due on their livestock. *See Bogue v. Roeth*, 98 Cal. App. 257, 276 (1929) (tender of full amount due for pasturage discharges lien and entitles owner to prompt delivery of livestock).

**F.    Sale Order**

Section 3080.06(b) requires that any order authorizing sale of livestock shall: "(1) Identify the livestock for which sale is authorized; (2) Specify the manner of sale including the date, time, place, necessary publication or other notice; and (3) Except as may be ordered pursuant to subdivision (c), direct the lienholder to deposit the proceeds of sale with the clerk of court pending final judgment in the action." Cal. Civ. Code § 3080.06(b)(1)-(3). Here, no sale date has yet been

---

[14] *See* Doc. 34-1, p.2; Doc. 34-1, p. 6; Doc. 35-1, p. 2; 38-1, p. 1; 39-1, p. 1.

[15] Certain documents indicate that Excalibur's mailing address is 1202 ½ 7th Street N.W., Suite 211, Rochester, Minnesota, 55901. Excalibur should inform JLG if either of these addresses is incorrect for purposes of giving appropriate written notice.

set because the Court had not yet authorized the sale.  JLG must submit a proposed sale order to the Court for approval that comports with each of the requirements of Section 3080.06(b)(1)-(3).  Once the proposed sale order is approved, the Court will issue the order, and JLG will then be permitted to proceed with the sale.  While the Court will grant JLG's motion to sell livestock, no sale may take place until such time as an approved sale order is issued by the Court.

**G.   Sale Proceeds Shall Be Deposited with the Clerk of the Court**

Section 3080.06(c) provides that a court ordering sale may, in its discretion, order the following:

> (1) Authorize the lienholder to deduct and retain funds from the sale proceeds in an amount sufficient to compensate the lienholder for services provided to the livestock from the date that the lien arose until the date of sale.

> (2) Determine the amount of sale proceeds reasonably necessary to satisfy the indebtedness secured by the livestock service lien and order any portion or all of the remaining sale proceeds distributed and applied as set forth in paragraph (3) of subdivision (c) of Section 3080.16.

JLG urges the Court to exercise its discretion and permit JLG to keep and deduct an amount of the sale proceeds to satisfy the lien.  JLG contends that, if it is required to deposit the entire proceeds with the Court pending final judgment in this matter, the unpaid balance will continue to accrue pre-judgment interest and finance charges and will increase JLG's damages. (Doc. 14, 13:26-28 - 14:1-3.)  JLG asserts that, if it is allowed to credit the proceeds of the sale against Excalibur's existing balance, it is likely that much of the amount owing will be paid and the case is more likely to settle. (Doc. 14, 14:3-5.)  Moreover, JLG notes that because Excalibur has threatened to file for bankruptcy, JLG may never recover the funds if they are deposited with the Clerk of the Court. (Doc. 14, 14:5-9.)

While the Court finds that JLG's lien against the bulls has probable validity, this is not a conclusive finding on the merits.  Excalibur's ownership of all of the bulls at issue has not been dispositively resolved.   Moreover, a certain amount of the outstanding balance is disputed, i.e., service and finance charges.  Further, it is unclear what application the automatic bankruptcy stay would have over proceeds from the sale of property that Excalibur has expressly disclaimed an ownership interest.  Given the dispute regarding ownership of the bulls – which has not been conclusively determined on the merits – and the dispute regarding the amount of service and finance

charges due JLG, the Court will exercise its discretion and order JLG to deposit the proceeds of the sale with the Clerk of the Court to be placed in an interest-bearing account.

### III.   CONCLUSION

The Court finds that the factors delineated in Section 3080.06 of the California Civil Code have been established and that sale of certain bulls in JLG's possession is appropriate.

Accordingly, IT IS HEREBY ORDERED THAT:

1.   Plaintiff's Application for an Order Authorizing the Sale of Livestock is GRANTED;

2.   JLG shall file a proposed sale order that comports with the substance of this order and the requirements of Section 3080.06(b) for the Court's approval on or before April 15, 2011;

3.   **This order is NOT to be construed as a sale order.** The form and content of the sale order will be proposed by JLG and is subject to further approval of the Court as provided herein;

4.   JLG shall file a proposed written notice of sale, on or before April 15, 2011, that comports with the requirements of Section 3080.17 for the Court's approval;

5.   Upon the Court's approval of the written notice, JLG shall serve the notice on Excalibur and the other purported owners of the bulls, as provided herein, at least 30 days prior to the sale date; and

6.   Once the sale order has issued and a sale occurs, proceeds from the sale shall be turned over to the Clerk of the Court to be placed in an interest-bearing account as specified in California Civil Code § 3080.16(b) until further order of the Court.

IT IS SO ORDERED.

**Dated:   March 22, 2011**                    _/s/ Sheila K. Oberto_
                                               UNITED STATES MAGISTRATE JUDGE